# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| TAWN BURCH and<br>BEN BICKERSTAFF,<br><br>    Plaintiffs,<br><br>v.<br><br>CHASE MANHATTAN MORTGAGE<br>CORPORATION, CHASE HOME<br>FINANCE, LLC, and CHASE HOME<br>MORTGAGE CORPORATION OF THE<br>SOUTHEAST,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO. 1:07:CV-0121-JOF |

## <u>AFFIDAVIT OF JOHN R. ULZHEIMER</u>

STATE OF GEORGIA  )
                 )
COUNTY OF FULTON  )

PERSONALLY APPEARED before me, an officer duly authorized by law to administer oaths, JOHN R. ULZHEIMER, who, after first being duly sworn, deposed and stated as follows:

1.

My name is John R. Ulzheimer, and I am competent in all respects to testify regarding the matters set forth herein.  I give this affidavit voluntarily in opposition

to the motions for partial summary judgment filed by Defendants in this action, and I have personal knowledge of the facts stated in this Affidavit and know them to be true.

2.

Attached hereto as Exhibit "A" is a true and correct copy of the Expert Witness Report that I prepared in connection with this matter. All of the statements and opinions set forth in my Expert Witness Report are still true and correct to the best of my knowledge.

3.

I spent six (6) years working with Equifax Credit Information, and an additional seven (7) years working with Fair Isaac Corporation (also known as "FICO" for their FICO credit scores).

4.

As a former employee of both Equifax Credit Information Services and FICO, I have been exposed to both proprietary and public processes and procedures involved in credit reporting, credit report dispute resolution practices, Fair Credit Reporting Act compliance, credit score model design and development and consumer credit risk management practices.

- 2 -

5.

During my time at Fair Isaac I was exposed almost constantly to users of credit reports and our FICO credit scores.  For the first 5 years of my time with Fair Isaac I was a part of the Credit Bureau Products Client Support group, which worked directly with lenders on their use of FICO scores.  I was also a regular presenter at Fair Isaac's quarterly seminar called Making Credit Bureau Scores Work For You, where I presented on various credit scoring topics such as design, development, calibration, validation, strategies for use in account acquisition, strategies for use in account management, strategies for use in account pricing, as well as other topics.  The attendees of these seminars were normally employees of lenders who were there to better understand how to use FICO scores in their work.  These seminars lasted for ~12 hours over two days and much of that time was spent discussing how the attendee's used scores in the process of assessing prospect, applicant and existing customer risk.  Further, I spent a significant portion of my time traveling to present one off seminars to either state level banking associations, or national associations including but not limited to regular presentations for various state mortgage broker association functions, mortgage banker functions, and the National Home Equity Mortgage Association.  In

- 3 -

addition, as part of my job I spent time working directly with large regional and national lenders on a one off basis in an effort to help them to better use FICO scores. All of these aforementioned engagements required that I become familiar with how these lenders use credit scores as part of their business practices. It is this experience, across a large number of varying sized lenders, that gives me the knowledge to discuss how lenders use scores and how they would typically react to various scores.

6.

As a result of my experience, I am familiar with how information in credit reports is compiled and the factors that will influence a consumer's credit rating.

7.

I am well qualified to interpret the direct and indirect impact of Defendants' actions to Plaintiffs' credit reports, credit scores, and credit reputation, and I am well qualified to discuss the impact of Defendants' actions on Plaintiffs' ability to secure financing.

8.

Due to their ability to directly affect consumers' credit scores, credit reports and credit reputation, lenders entrusted by the credit reporting agencies with the

ability to add, alter, or change consumer credit information appearing on their credit reports should be held to the highest standard of care in protecting and maintaining the accuracy and integrity of such credit information.

9.

The tax fifas issued on the 795 Holmes Street property caused for no other reason than the late payment of the 2001 supplemental tax bill by Chase still appear on Plaintiffs' credit reports currently, and will remain through at least 2009 causing damage to Plaintiffs' credit reports, credit scores and credit reputation.

10.

After the tax liens were recorded by Fulton County, a common and foreseeable result of the recording of the liens is that they would be picked up by and reported by the credit reporting agencies thereby causing damage to Plaintiffs' credit reports, credit scores and credit reputation.

11.

The tax lien relating to the late payment of the 2001 supplemental tax bill appears as multiple liens on some versions of Plaintiffs' credit reports, and the appearance of multiple tax liens can have a compounding negative effect on

Plaintiffs' credit scores due to the "prevalence" factor in all credit-risk scoring models.

12.

As a result of the negative information relating to the tax fifas appearing on their credit reports, Plaintiffs credit scores have been adversely affected and they have been denied certain loans and have also been forced to accept higher interest rates on other loans for which they were still able to qualify.

13.

In an Experian Report for Plaintiff Tawn Chi Burch dated February 10, 2006 that was produced by Defendants as CHF 000004, Chase Loan # 0909843901 was being reported as a "foreclosure."

14.

Due to the limited ways that information is gathered from data furnishers and compiled to create consumer credit reports, the only reason that Experian would have reported Chase Loan # 0909843901 as a foreclosure on Ms. Burch's February 10, 2006 credit report would be because Chase had reported that information to Experian on or near February 10, 2006. Each of the credit bureaus

compile their own information independently of the others, and they do not share consumer information between themselves.

15.

References of "claim filed with government" referring to the foreclosure that never actually occurred appeared on Ms. Burch's TransUnion credit report as recently as 9/17/07.

16.

After the foreclosure was incorrectly reported on Ms. Burch's credit report, a common and foreseeable result of the reporting of this incorrect credit information is that it would cause damage to Ms. Burch's credit report, credit score and credit reputation.

17.

The appearance of the incorrect reference to a foreclosure on Ms. Burch's credit report is commonly considered a "major derogatory item" by credit-risk scoring models, and would greatly damage her credit score and credit reputation during the time period that it appeared on her credit report.

18.

As a result of the inaccurate negative information relating to the foreclosure appearing on Ms. Burch's credit reports, Plaintiffs credit scores have been damaged and Ms. Burch has been denied certain loans and has also been forced to accept higher interest rates on other loans for which she and Mr. Bickerstaff were still able to qualify.

19.

In approximately July 2006, Chase performed an appraisal that Plaintiffs have testified was without their authorization or approval, and improperly charged Plaintiffs' Chase credit card account no. 4357873930064200 for the appraisal. This account was then subsequently reported as having a "late payment" when Plaintiffs refused to make payment for the disputed and unauthorized charge, which appeared on several of Plaintiffs' credit reports until Chase chose to remove the late payment, which is a practice uncommon unless the data furnisher recognizes that the information is erroneous. A common and foreseeable result of the reporting of this incorrect credit information relating to the unauthorized charge is that it would cause damage to Plaintiffs' credit reports, credit scores and credit reputation.

20.

As a result of the improper and incorrect information appearing on Plaintiffs' credit reports as a result of Chase's actions and/or inaction discussed above, Plaintiffs have incurred damages as a result of the less than optimal interest rates they received on the nine loans financed during the relevant time period, have incurred damage to their credit scores and credit reputation, and have incurred significant attorneys' fees and expenses in pursuing this litigation.

FURTHER AFFIANT SAYETH NAUGHT.

This 19th day of February, 2008.

John R. Ulzheimer

Subscribed to and sworn before me this 19 day of February, 2008.

Notary Public

JARVIS J. PERRY
NOTARY
EXPIRES
GEORGIA
MARCH 18, 2009
PUBLIC
DEKALB COUNTY

- 9 -

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

TAWN BURCH and )
BEN BICKERSTAFF, )
        )
       Plaintiffs, )
        )
v. )    CIVIL ACTION
        )    NO. 1:07:CV-0121-JOF
CHASE MANHATTAN MORTGAGE )
CORPORATION, CHASE HOME )
FINANCE, LLC, and CHASE HOME )
MORTGAGE CORPORATION OF THE )
SOUTHEAST, )
        )
       Defendants. )

## EXPERT WITNESS REPORT OF JOHN R. ULZHEIMER

I, John R. Ulzheimer, the undersigned, upon oath hereby depose and state the following: I have prepared the following Expert Witness Report for your examination and consideration in the above-named action. My statements are based partially on my 16 years of experience and knowledge I gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com and Credit.com Educational Services, and partially on my review of relevant document and also on conversation with the Plaintiffs. All of my comments are accurate to best of my ability as of the time I drafted this Report.

Specifically, I have been asked to review documents provided by Plaintiffs and Plaintiffs' counsel, which are related to the above named action. And, I have been asked to provide my expert opinion based on the facts of the case.

**Qualifications**

All that I state will be based on my extensive experience in the credit, credit reporting, and credit scoring industries. I spent six (6) years with Equifax Credit Information Services and spent several of those years managing a team of consumer service agents which handled thousands of consumer calls and credit report disputes on a daily basis.

While at Equifax I gained an intimate understanding of how credit reports are created, stored, and delivered. I also am well versed on how information is reported and corrected by data furnishers.

At Fair Isaac (also known as "FICO" for their FICO credit scores) I spent an additional seven (7) years gaining an intimate understanding of credit scoring, including how credit scores are designed, developed, used by lenders and impacted by the information in consumer credit files. I was also involved with the development of FICO credit bureau scorecards, which are the heart of the credit scores.

I have made no less than 500 credit scoring presentations during the past 10 years. These presentations were of varying levels of complexity and were delivered to consumers, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress and banking authorities. I also teach an ongoing class on credit reporting and credit scoring at Emory University's Center for Lifelong Learning in Atlanta, Georgia and have been a guest lecturer on the same topics at the University of Georgia, LaGrange College and the Westminster Schools, which is also located in Atlanta.

In addition to the above, I also have appeared on the FOX Business Network, CNN's "Open House", CNN's "Dollar Signs" and Oprah's "Oprah and Friends" XM Satellite Radio show discussing credit reporting and credit scoring. I have also contributed content and advice for Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. I am a frequent contributor of credit advice and analysis for various media outlets including USA TODAY, Los Angeles Times, CNN.com, Washington Post, Money Magazine, American Banker, Chicago Tribune, Wall Street Journal, SmartMoney, MarketWatch, FOX News, MSNBC.com, The New York Post, New York Daily News, TheStreet.com, Bankrate.com, and other regional business and consumer media. I have also written books and training manuals on the same. And finally, I volunteer my time to teach credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

As a former employee of both Equifax and Fair Isaac I have been exposed to both proprietary and public processes and procedures involved in credit reporting, credit report dispute resolution practices, Fair Credit Reporting Act compliance, credit score model design and development and consumer credit risk management practices.

I am well qualified to interpret the direct and indirect impact of Defendants' actions to Plaintiffs' credit reports, credit scores, and credit reputation. Further, I am well qualified to discuss the impact of Defendants' actions on Plaintiffs' ability to secure financing.

2

**Relevant Events**

After reviewing the information provided to me by Plaintiffs, Plaintiffs' counsel and interviewing the Plaintiffs, I was able to create a list of what I consider to be relevant events, which are stated below.

- On or just before July of 2002 the Plaintiffs jointly applied for and were approved for a mortgage to re-finance a piece of property located at 795 Holmes Street in Atlanta, GA. Said mortgage was with Chase.
- Sometime during December of 2002 or soon thereafter, the Fulton County Tax Commissioner (Fulton County, Georgia) filed a lien on the property because of unpaid property taxes. These taxes were to have been paid by Chase as they had been impounding funds each month necessary to cover the costs of both homeowner's insurance and property taxes. Chase failed to pay the Plaintiffs' property taxes due to a self-reported "system discrepancy" on their end, thus causing the Fulton County Tax Commissioner to file the tax lien. This despite the Plaintiffs contacting Chase multiple times that the tax bill was due and needed to be satisfied from funds already deposited in their escrow accounts. According to Plaintiffs they sent a copy of the tax bill to Chase's escrow department.
- This tax lien was picked up by TransUnion, one of the national credit reporting agencies, sometime during December of 2002 or soon thereafter and began reporting it as part Plaintiffs' credit files.
- Chase acknowledged their error in a letter to the Fulton County Tax Commissioner dated April 15th 2005.
- During the period of time that the Plaintiffs' credit reports were populated with the incorrect information regarding the tax lien they were denied credit or received disadvantaged approvals. The list of lenders includes Wachovia, Comcast, American Express, Home Depot Credit Services, SunTrust, Bank of America and Family Home Lending.
- In July of 2004 Plaintiffs began asking TransUnion to remove the lien from their credit reports. There were also subsequent requests of a similar nature. Unfortunately they were unsuccessful in getting the record of the tax lien removed from their credit reports. Record of the lien still shows up on their credit reports at TransUnion as recently as credit files dated 09/2007. This means that Plaintiffs are still suffering damage to their TransUnion credit reports, FICO scores at TransUnion and their credit reputation due to Chase's negligence in not paying their property taxes.

3

- In July of 2004 Plaintiffs also began asking Chase to have the lien removed from their credit files at TransUnion. As the Plaintiffs and Defendant have no doubt learned, it's virtually impossible to have data removed from a credit report if you are not the data furnisher even if you caused, by way of negligent action or inaction, the data to be reported. As such, Chase was unsuccessful in getting the lien removed from their TransUnion credit reports despite their letter to Fulton County dated 04/2005.
- In addition, Chase inexplicably begins to report to Tawn Chi's credit report maintained by **Experian** (delivered via myFICO.com website on 1/24/06) that Chase Loan No. 0909843901 was subject to foreclosure as of 04/2002 despite the fact that the loan was satisfied by full payoff on October 31, 2001, as acknowledged in a letter written by Chase to the Plaintiffs.
- In addition, Chase inexplicably begins to report to Tawn Chi's credit report maintained by **TransUnion** (delivered to Plaintiff's counsel on Sept 13, 2007) that Chase Loan No. 0909843901 was subject to foreclosure as of 10/01 despite the fact that the loan was satisfied by full payoff on October 31, 2001, as acknowledged in a letter written by Chase to Plaintiffs.
- In 12/2005 Plaintiffs began disputing the incorrect reference of foreclosure or government claim with Chase. On a credit file issued by Experian dated 11/2007 it appears that the incorrect reference to foreclosure has been removed. However, on a credit file issued by TransUnion dated 9/17/07 the incorrect reference to government claim is still present.
- In 8/06, Equifax was reporting Plaintiffs' Chase credit card as past due in the amount of $126, which, in part, resulted in a credit score of 618 for Tawn Chi at that time. This item, according to Plaintiffs, was another error on behalf of Chase, albeit their credit card division. It appears that this item was corrected by Chase because in every other circumstance the Equifax FICO score is considerably higher than 618 (764, 760). What this leads me to believe is that, once again, Chase, albeit their credit card division rather than their mortgage division, caused damage to Tawn Chi's credit report at Equifax. Any reasonable credit professional would interpret the removal of the negative data as Chase's acknowledgment and correction of the error. Data furnishers do not, as a matter of practice, remove accurate and negative information.

## Impact to Plaintiffs' credit reports, credit scores and reputation

When a consumer applies for some sort of financial service such as a loan or credit card, the lender generally pulls a copy of their credit history, commonly called a credit report or credit file, from one or more of the recognized credit reporting agencies.

Credit scores, commonly the "FICO®" scores, normally accompany the credit reports as a means to summarize the data on a consumer's credit file in numeric form.

In almost all lending only one of the consumer's credit files will be pulled for the purposes of risk assessment. The exception to this is when a mortgage loan has been applied for. In almost all cases the mortgage broker or lender will require that three credit reports and three credit scores be pulled for any/all applicants for a mortgage loan. This means that in the circumstance where there is a joint application for a mortgage, the lender will request six (6) credit reports and six (6) FICO credit scores, one set from each of the credit reporting agencies Equifax, Experian and TransUnion.

In addition to the scores, lenders use the data in the applicant's credit files to determine credit risk. Once risk is determined, the lender will either approve the offer with terms applicable to the applicant's risk or decline the offer outright. Point being that a lender's decision is not always solely score driven and it's not always solely data driven but more so a combination of credit data, credit scores and individual lender and investor policy driven.

Tawn Chi and Ben Bickerstaff own and operate a real estate investment company known as TC Properties. As a real estate investment company they rely on mortgage lenders to fund the purchase of real estate. These purchases are priced and termed based in part on the data in Plaintiffs' personal credit reports and their credit scores. The better their credit reports and scores, the better deals they are going to get on mortgage loans. The deals they get on mortgage loans are going to become less attractive if their credit reports and credit scores cause a lender to conclude that they are a poor credit risk. As such, it is extremely important for the health and profitability of their business that they have and maintain solid credit histories and solid credit scores.

It appears to me that the actions of the Defendant caused there to appear derogatory information on the credit reports of the Plaintiffs. Specifically the tax lien filed in Fulton Country, Georgia and a listing of a foreclosed mortgage loan reported by Chase. Each of these items stands on their own as separate and unique derogatory items on the Plaintiffs' credit reports.

**Foreclosure –**

The notice of foreclosure showed up/shows up on the credit reports belonging to Tawn Chi maintained by Experian and TransUnion. I cannot conclude that the foreclosure showed up on the credit reports belonging to Ben Bickerstaff, although that can be ascertained by subpoenaing archive credit reports from Experian,

5

TransUnion and Equifax if need be. The fact that it shows up on any of Tawn's credit reports means that a mortgage lender will see it when they go through the process of acquiring her three credit reports. It cannot be hidden even due to incomplete bureau coverage.

It is very reasonable to conclude that any mortgage applications that she submitted were categorized as higher risk than appropriate because of the foreclosure listing, regardless of her credit scores. In the mortgage environment general credit risk is important but a notice of foreclosure is even more important because it demonstrates an inability to properly manage the type of loan that the applicant wants from a mortgage company.

In addition, the Fannie Mae and Freddie Mac desktop underwriting tools known as "DU" for Desktop Underwriter and "LP" for Loan Prospector have non-scoring criteria programmed that further penalizes a potential borrower if they have record of foreclosure on their credit files, especially if the foreclosure is fairly recent, say within 2 years. However, given the current credit and mortgage environment the criteria lenders and the GSEs set has become more restrictive. Credit quality is more important today than it has been in recent years. This makes having an accurate and impressive credit report and credit score even more important.

Credit scores are very advanced and complex systems however they do have one handicap. They cannot validate information on credit reports. Scoring models do not have the ability to discount or bypass information based on assumed validity or invalidity. They have to assume that all of the information on a credit report is accurate as reported. For this reason the foreclosure information is damaging the Plaintiffs' credit scores, because the model cannot bypass the information as being inaccurate.

A foreclosure is generally and commonly known in the non-scoring world as being a negative occurrence. Within the credit scoring world a foreclosure is considered to be a major derogatory item. Credit files that have a notice of foreclosure generally belong to consumers who pose a greater credit risk to lenders than consumers who do not have a listing of foreclosure. It's because of this reason that the score is penalized because of the listing.

The purpose of a general use credit score, like the FICO score, is to provide a lender with an odds-based assessment of future performance. The performance definition (the model's design purpose) of the FICO score is to predict the likelihood of a consumer paying any of their credit obligations 90 days past due or worse in the

6

subsequent 24 months after the score is calculated. This is sometimes represented as such (90DPD+:24).

It's safe to say that credit scores tend to act similar to water with respect to movement; they will always take the path of least resistance. This means that a credit score that is very good will be damaged more because of the listing of a major derogatory item/s than someone who already has a poor credit score. This is the case in the Plaintiffs' situation.

**Tax Lien –**

From a credit scoring perspective the incident of the tax lien was not the most damaging factor. The fact that the lien was listed in addition to another tax lien on Plaintiffs' credit files is what's important here. There is a component within credit scoring models that not only measures the presence of negative credit data, but also the prevalence of negative data.

In this particular case the tax lien shows up, on some vintages of their credit reports, as multiple tax liens. And, it accompanies another lien caused by an unrelated incident. This causes the credit scoring models to penalize the Plaintiffs' credit scores not simply because there is a tax lien, but because of the total number of negative items.

So, for example, on Tawn's TransUnion credit report dated 9/17/07 there appear to be four separate derogatory items, 3 tax liens and a foreclosure (listed here as a government claim). There is, in fact, only one valid derogatory item, which is the lien listed from 10/04 in the amount of $190. The actions of the Defendant cause the credit report to show four times the actual amount of derogatory items, and credit scoring models pick up on this and penalize the consumer because of the prevalence of derogatory information.

**Practical and Operational Interpretation Scoring Damage –**

Credit scoring models do not set terms or deny consumer applications. They simply provide an assessment of credit risk so that lenders can better understand the future performance of an applicant or a current customer. With this understanding they can set terms appropriate for the expected level of risk.

The use of credit scores is also not a random practice. All lenders, sophisticated or not, perform some sort of validation prior to setting polices such as score cut-offs and

7

accompanying pricing policies. This means that lenders actually interpret scores and generally that interpretation is in the form of expectation odds. For example, a credit score of 800 might mean that the lender will see 500 good customers for every 1 bad customer as defined by 90DPD+:24, represented as 500:1 Good/Bad odds. This understanding allows the lender to price out the financial services product based on the understanding that for every 501 customers they book, only 1 will go bad.

As the scores decrease so do the Good/Bad odds. The challenge for lenders is to understand, clearly, the expected odds at any given score point, especially if they have financial service products available for a wide variety of risk levels. As a part of development Fair Isaac incorporated a feature not widely known except for only those intimately familiar with credit score implementation, calibration and risk policy assignment and strategy. This feature, which is not a trade secret, is called PDO. PDO is the acronym for "Points to Double Odds" and it's simply that, the number of credit score points for the odds to double for any given consumer or group of consumers in similar score bands. In FICO's case the PDO is 40.

In my example above the hypothetical lender realized 500:1 Good/Bad odds at a score of 800. At a score of 840 the same lender should see close to 1000:1 Good/Bad odds. And at a score of 760 the same lender should see close to 250:1 Good/Bad odds. At a 720 the same lender should see close to 125:1 Good/Bad odds. And at a score of 680 the lender should see close to 63:1 Good/Bad odds. You can see how quickly the quality of the applicant deteriorates even with just a difference of 40 to 80 points.

This is important to understand because as a layman most consumers will look at scores that are above the hypothetical threshold between "good" and "bad" and interpret them all as being good. For example, the difference between a 760 and a 720 is significant from a risk assessment perspective but only 40 points different and both decent scores. It's critical to look at score differences not from a raw "point difference" perspective but more so from the perspective that a lender would take, as that's the most important perspective especially when you are applying for credit.

The Plaintiffs' credit scores in many of the vintages observed are radically different across the credit bureaus. Here are some examples of the differences in scores at the same point in time for Tawn Chi:

8/05 – 764, 752, 665
8/06 – 779, 734, 618
1/06 – 760, 706, 676

8

Here are some examples of the differences in scores at the same point in time for Ben Bickerstaff:

1/06 – 778, 720, 684
10/05 – 779, 711, 688

You can attribute some of the score differences to the differences in data maintained by the credit bureaus. But, that does not explain the transcending of the aforementioned threshold between a good score and a bad score. That's largely a product of the negative data appearing on one credit report and not the other.

In all but one case the lowest score is being calculated by the credit reporting agency where the negative information, either the liens or the foreclosure or both, are being reported. And while ascertaining the exact point damage caused by each of these incidents is impossible without hand scoring the credit file using the original FICO scorecards it is easy to conclude that there is significant score damage being done because of the Defendant's actions.

Note: The exception is the score of 618 calculated by Equifax in 8/06. It appears that a Chase credit card is being reported as past due in the amount of $126. This item, according to Plaintiffs, was another error on behalf of Chase's, albeit their credit card division. It appears that this item was corrected by Chase because in every other circumstance the Equifax FICO score is considerably higher than 618 (764, 760). What this leads me to believe is that, once again, Chase, albeit their credit card division rather than their mortgage division, caused damage to Tawn Chi's credit report at Equifax. Any reasonable credit professional would interpret the removal of the negative data as Chase's acknowledgment and correction of the error. Data furnishers do not, as a matter of practice, remove accurate and negative information.

**Other Important Observations -**

- Although their scores have improved over time this is due to the aging of derogatory items. Negative credit information begins to lose negative value over time and, as such, scores will organically improve even though the data is still present. However, the scores are still not as high as they should be and lenders can still deny or counter with disadvantaged terms due to non-scoring policies. This is commonly referred to as a high side override, which probably happened with Wachovia denials. Tawn's score was decent (700+) but she was still denied.
- It's these types of examples where a consumer gets caught in the gears of a large, slow moving, and inefficient bank. This is why consumers by and large

9

do not trust their banks. In this case Chase was grossly negligent, unresponsive and still today fights to avoid liability for their own actions. Yet, the Plaintiffs have had to live with damaged credit reports for years and will continue to live with them for many more years.

- Chase's actions put the Plaintiffs into a no win situation. Their refusal to pay the required property taxes by the date demanded by Fulton County forced the county to file a tax lien, which is then picked up by the credit reporting agencies. At this point even if Chase admits liability, pays off the liens, and explains in great detail the fact that the Plaintiffs were not the cause of the non-payment, it's irrelevant to the county. In their eyes they were, in fact, not paid their monies on or before the date demanded. In their opinion the Plaintiffs are liable for the taxes, regardless of whether or not Chase was impounding funds for taxes or not. That's why Chase can't get the lien's removed by going directly to the court with their request or explanations.

## Damages

After reviewing the case documents I believe that the damages as outlined in the Plaintiffs' letter dated April 11, 2007 are not only reasonable but might even be too reasonable considering the abusive nature of the Defendant's actions and inactions. Any company or individual that has the ability to directly add information or, by way of action, cause information to be added to someone's credit files has an enormous obligation to consumers to ensure that the information is accurate. It is so easy to damage someone's credit report and so difficult for the consumer to have it corrected. This is a perfect case of how apathy leads to many years and tens and possibly hundreds of thousands of dollars of credit damage, not to mention the damage to the reputation of the Plaintiffs, which many consider, including myself, to be priceless.

Simply put, there is no other credit-based reason for the Plaintiffs to have been denied loans. Prior to the lien and foreclosure being reported their credit scores were in the 730+ range even with the unrelated tax lien, which is widely considered to be credit elite. After the inaccurate information was reported to their credit files their scores reset to the mid to high 600 range. This dropped them to the lowest scoring 30% nationally.

This means that lenders now viewed Plaintiffs as having a higher degree of credit risk and therefore would want to somehow mitigate their risk. Some lenders will approve applicants of higher credit risk but will mitigate by charging them higher interest rates, in addition to other less attractive terms. Some lenders will simply avoid applicants of higher risk and deny them outright.

10

The irony here is that whatever lender/s did/do approve Plaintiffs subsequent to the incorrect credit reporting were/will be able to charge high risk interest rates to low risk applicants, surely a good deal for them and a bad deal for the plaintiffs. Or, they can charge excessive fees in the form of "discount points" in exchange for a lower interest rate on mortgages. Either way the lender profits at a rate disproportionate to the Plaintiffs' true credit risk.

Based on their current credit reports and scores the Plaintiffs will not be offered the most attractive rates and terms. They'll have to settle for less desirable terms than they should be offered.

**Duration of Damages**

It's also important to point out that Defendant's actions have put Plaintiffs in what can be referred to as a no-win situation. By not paying their property taxes and causing the County to file a tax lien they essentially caused a 3rd party to contribute, albeit via a public record vendor, negative information to Plaintiffs' credit reports.

Normally when a data furnisher reports something that is inaccurate they also have the ability to correct or have removed the incorrect data. In this case Chase caused the inaccuracy but has no authority over the data since they are not, technically, the furnisher of the information.

Since it is a fact that Fulton County filed a tax lien it will be impossible for Plaintiffs to challenge the accuracy and have it removed. This means that the Plaintiffs will have to live with the tax lien and the damage that it will cause for the entire amount of time that it can legally be reported on their credit files. In the state of Georgia, where the Plaintiffs reside, the statute of limitations for this type of information is seven (7) years from the date paid. This means that the lien will be removed in 2011, as communicated to Plaintiffs by TransUnion. The Plaintiffs can either cease to operate their business until that time or they can continue to pay more for funding up to that date.

**I state the above opinions with a significant degree of confidence.**

**Compensation**

I am being compensated for my expert opinion and assistance at a rate of $275 per hour for consulting and $325 per hour for testimony.

11

This day 11/30/07

Respectfully submitted,

John R. Ulzheimer
1954 Saxon Valley Circle NE
Atlanta, Ga 30319

12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| TAWN BURCH and<br>BEN BICKERSTAFF, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 1:07:CV-0121-JOF |
| CHASE MANHATTAN MORTGAGE | ) | |
| CORPORATION, CHASE HOME | ) | |
| FINANCE, LLC, and CHASE HOME | ) | |
| MORTGAGE CORPORATION OF THE | ) | |
| SOUTHEAST, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the EXPERT WITNESS

REPORT OF JOHN R. ULZHEIMER upon counsel for the opposing party by

facsimile and by placing a copy of same in the United States Mail in an envelope

properly addressed and with adequate postage affixed thereon and via facsimile to:

John C. Porter, Jr., Esq.
Smiley Bishop & Porter, LLP
1050 Crown Pointe Parkway
Suite 1250
Atlanta, Georgia 30338

13

This 30th day of November, 2007.

Harry J. Winograd
Georgia Bar No. 770926
John H. Killeen
Georgia Bar No. 417551

BODKER, RAMSEY, ANDREWS,
WINOGRAD & WILDSTEIN, P.C.
One Securities Centre
3490 Piedmont Road, Suite 1400
Atlanta, Georgia 30305-4808
Telephone:  (404) 351-1615
Facsimile:   (404) 352-1285

14

### John Ulzheimer Bio and CV

John Ulzheimer, president of Credit.com Educational Services and The Ulzheimer Group, LLC, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition to his expertise in personal finance and consumer issues, John also serves as an expert witness and legal consultant for clients involved in credit related litigation.

John has over 16 years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years) and The Fair Isaac Corporation (inventors of the FICO® credit scoring system) (7 years). He has authored numerous educational books including *The GetCreditWise ToolKit* and the recently released *You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies.* John is also the co-author of the consumer handbook, *Surviving Identity Theft.*

John has appeared on Fox Business Network, CNN's "Open House", "Dollar Signs" and Jean Chatzky's "Oprah and Friends" XM Satellite Radio show. He has contributed content for Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show.  John is also a frequent contributor of credit advice and analysis for various outlets including USA Today, Los Angeles Times, CNN.com, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, FOX News, MSNBC.com, The New York Post, New York Daily News, TheStreet.com, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John teaches an ongoing course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term. He is also a regular guest lecturer at The Westminster Schools in Atlanta.

Recent cases include:

Miley v Credit Bureau of Baton Rouge – Expert for defense, case settled
Celestial v GreenPoint Mortgage – Expert for defense, case settled
Acosta v TransUnion, et al – Expert for plaintiff, case in progress
Webb v Headland Mortgage – Expert for defense, case in progress
Equifax/Fair Isaac – Arbitration, unpaid consultant serving both