# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

TAWN BURCH and       :
BEN BICKERSTAFF,       :
      :
    Plaintiffs,      :
      :   CIVIL ACTION NO.
    v.        :   1:07-CV-0121-JOF
      :
CHASE MANHATTAN MORTGAGE   :
CORPORATION, et al.,      :
      :
    Defendants.     :

## OPINION AND ORDER

This matter is before the court on Defendants' motion for partial summary judgment [30]; Defendants' motion for partial summary judgment [31]; Plaintiffs' motion to strike Defendants' motions for partial summary judgment [39]; Defendants' motion to strike affidavit and expert opinion [45]; Defendants' motion to strike affidavit of Ben Bickerstaff and Tawn Burch [46]; Defendants' motion to strike testimony and letter of David Wright [47]; and Plaintiffs' motion to strike response [50].

## I. Background

### A. Procedural History and Facts

Plaintiffs, Tawn Chi Burch[1] and Ben Bickerstaff, filed suit against Defendants, Chase Manhattan Mortgage Corp, Chase Home Finance, LLC, and Chase Home Mortgage Corporation of the Southeast, on August 28, 2006, in the Superior Court of Fulton County, alleging breach of contract, breach of fiduciary duty, negligence, and damage to reputation arising out of problems with Plaintiffs' mortgage with Defendants and an alleged resultant drop in Plaintiffs' credit scores. Plaintiffs also seek punitive damages and attorney's fees pursuant to O.C.G.A. § 13-6-11. Defendants removed the suit to this court on January 17, 2007.

Plaintiffs are a husband-and-wife business team who have developed a real estate business of buying and holding residential rental properties for long-term investment. *See* DSMF, ¶ 1. Plaintiffs use loans to purchase these properties and since 2001 have held fourteen properties, all but one financed through loans. *Id.*, ¶ 2. Both Plaintiffs hold real estate licenses and have attended numerous closings. *Id.*, ¶ 3. Other than their own experiences in obtaining loans, Plaintiffs have no training or expertise in underwriting loans or calculating credit scores. *Id.*, ¶ 4.

---

[1]The parties have referred to Tawn Chi Burch as both "Ms. Chi" and "Ms. Burch." For the ease of clarity, the court refers to her as Ms. Burch.

2

In 1985, Plaintiffs purchased a property located at 795 Holmes Street, Atlanta, Georgia. *Id.*, ¶ 6. That purchase was financed through a loan which was refinanced in 1992 through Home Banc. *Id.*, ¶ 7. The parties dispute whether the Home Banc loan had an escrow provision. *Id.*, ¶¶ 8-9 and responses. In April 2001, the Home Banc loan was transferred and assigned to Chase. *Id.*, ¶ 9. No escrow account was maintained by Chase on the loan between April 2001 and October 21, 2001, when Chase refinanced the loan. *Id.*

The 2001 property taxes on the property became due in August 2001, however, Plaintiffs disputed the 2001 tax assessment and filed an objection to the taxes. *Id.*, ¶¶ 10-11 and responses. The undisputed portion of the 2001 tax liability was paid out during the closing of the refinancing on October 21, 2001. *Id.* As part of the refinancing, Plaintiffs signed a Security Deed on October 25, 2001, which was recorded in the Fulton County records. *Id.*, ¶ 12 and response. Section 3 of the Security Deed requires Plaintiffs to make payments to an escrow account set up by Chase for the purpose of assuring that property taxes and hazard insurance were paid. *Id.* Under the terms of the Security Deed, it is Plaintiffs' obligation to pay all property taxes, but to ensure payment of the taxes, Chase agrees to set up an escrow account. *Id.*, ¶ 48. As a condition of paying taxes from the escrow account, Section 3 of the Security Deed requires that "Borrower shall promptly furnish Lender all notice of amounts to be paid under [the escrow]." *Id.* Under Section 3 of the Security Deed, Plaintiffs were not entitled to interest or other fees on the loan and

3

were only entitled to any surplus proceeds after all debts owed to Chase had been paid in full. *Id.*, ¶¶ 13-14 and response.

According to Plaintiffs, in late August or early September 2002, Plaintiffs received a supplemental property tax bill for the year 2001 denying their challenge to the assessed value of the property. *Id.*, ¶ 15. Plaintiffs claim they contacted a Chase customer service representative and informed the representative of the supplemental tax bill. *Id.* That representative apparently instructed Plaintiffs to fax the bill to an entity called IPC. *Id.*, ¶ 16 and response. Customer service logs of IPC show that a fax was received from Plaintiffs and it was then forwarded back to Chase. *Id.* Chase, however, has no record of receiving this information at the beginning of September 2002, and asserts that it first received notice of the outstanding tax bill on March 6, 2003. *Id.* Chase paid the tax bill in March 2003. But unbeknownst to the parties, Fulton County had recorded a tax lien on the property in December 2002. *Id.*, ¶ 17. The court refers to this as the December 2002 tax lien.

Mr. Bickerstaff testified that he received notice of the intent to file a tax lien at the end of October 2002. *Id.*, ¶ 58 & Bickerstaff Depo., Exh. 37. He further stated that he called Chase and faxed a copy of the notice to Chase. *Id.* & Bickerstaff Depo., Exh. 38 (fax from Ms. Burch to Escrow/Tax Department at Chase Manhattan Mortgage Corporation, dated Nov. 3, 2002, attaching notice of intent to issue fi fa from Fulton County).[2] Mr.

---

[2]A fieri facias is a writ of execution that allows a sheriff to seize a defendant's property to satisfy a money judgment. It is commonly referred to as a "fi fa."

4

Bickerstaff does not have confirmation that the fax reached Chase Manhattan, but Chase's own records indicate that Mr. Bickerstaff spoke to Chase on September 5, 2002, November 25, 2002, and March 6, 2003. *Id.*, ¶ 59 and response. According to Chase's customer service records, Plaintiffs called on November 25, 2002, and the Chase customer service representative told Plaintiffs to "get a copy of the bill and call so a route can be opened and fax [the bill] to the tax department." *Id.*, ¶ 60 and response.

Defendants dispute that Mr. Bickerstaff conveyed a copy of the tax notice to Chase in November 2002. They point out that Ms. Burch wrote a letter to Chase on September 17, 2004, in which she recounted the chronology of events as: "My first notification was September 9, 2002 after speaking with a customer service person. I was instructed to fax the letter and tax notice to 678-475-8799[.] When it came to my attention that nothing had been done, I faxed again after speaking with Chase Representative Nita to 801-743-8024 on March 6, 2003." *Id.*, ¶ 62 & Burch Depo., Exh. 13.

Ms. Burch testified in her deposition that a lender informed her in July 2003 that her credit score had been adversely affected by the existence of a tax lien recorded in the Fulton County records. *Id.*, ¶ 19. That tax lien was marked as unpaid. *Id.* This lender also told Ms. Burch that the appearance of a tax lien, whether satisfied or not, injured their credit rating. *Id.*, ¶ 24 and response. After learning this information, Mr. Bickerstaff went to the

5

Fulton County Property Tax Office and had the tax lien marked as satisfied in July 2004. *Id.*, ¶ 21 and response.

During 2003 and 2004, Plaintiffs and Chase had numerous conversations about the tax lien record. *Id.*, ¶ 25 and response. Plaintiffs asked Chase to remove the record of the lien, however, Chase informed Plaintiffs that because the lien had been placed by Fulton County, Chase could not have the credit reporting agencies remove the reference to the lien. *Id.* At the request of Plaintiffs, on September 30, 2004, Chase's tax department did send a letter to the Fulton County Tax Authority which stated that "[b]ecause of a discrepancy in our system, the real property taxes for [the loan on 795 Holmes Street] were inadvertently not paid prior to the penalty date. This situation was not the result of the homeowner's failure to pay the property taxes in a timely manner." *Id.*, ¶ 26 and response.

The December 2002 tax lien was not the only lien reported on the property at 795 Holmes Street, Atlanta, Georgia. There are at least six other tax liens of record in Fulton County and Lumpkin County, Georgia filed against Plaintiffs' and the properties owned by Plaintiffs that are not alleged to have resulted from any act or omissions by Chase. *Id.*, ¶ 138. Plaintiffs owed delinquent property taxes for the 1999 tax year in the amount of $255.55. *Id.*, ¶ 42. A tax lien was issued by the Fulton County Tax Assessor's Office. *Id.* The tax lien was then purchased by an entity called Heartwood II. *Id.* The $255.55 in taxes owed was paid off by the proceeds of the Chase refinancing loan on October 21, 2001, but

6

the tax lien remained on the record and was marked as satisfied. *Id.*, ¶ 43. A fi fa was recorded on the property in December 2000 for a tax amount of $535.73 and $1,356.13. *See* Defendants' M.S.J., Exh. E. Those fi fas were marked as satisfied on October 19, 2001. *Id.* There was also a fi fa recorded on other properties owned by Plaintiffs at 845 Spring Street NW (January 2005); 3057 Pharr Court (December 1999) in the amount of $376.21 and (March 2000) in the amount of $20.99. *See id.* A lien was recorded on property owned by Plaintiffs in Lumpkin County on October 12, 2004 in the amount of $190.03. *Id.* That lien was marked as cancelled on January 21, 2005. *Id.* A lien was recorded on the same property on September 8, 2003, in the amount of $179.47, and marked as cancelled on July 2, 2004. *Id.*

On or about August 8, 2005, Plaintiffs received notice that the credit reporting agency, TransUnion, was reporting that Chase had foreclosed on a loan Chase entered into with Plaintiffs in the early 1990s, referenced as Account #0909843901. *Id.*, ¶ 27. This statement was incorrect. *Id.* Plaintiffs paid off this loan on October 21, 2001, and Chase never foreclosed. *Id.* Equifax also noted the foreclosure. *Id.*, ¶ 28. Each month, Chase gathers electronic credit information on the accounts it services. *Id.*, ¶ 31 and response. It then transmits the same electronic information to all three major credit reporting companies, Experian, TransUnion, and Equifax. *Id.* The foreclosure information appeared only on TransUnion's credit report. *Id.*, ¶ 32. Sample batch reports on March 15, 2002 and

7

April 15, 2002 do not indicate the loan was subject to foreclosure, but rather report that the loan was paid off. *Id.*, ¶¶ 32-33 and response. Reports from July 15, 2005 and August 15, 2005 show that Chase made no report at all on the loan. *Id.*, ¶¶ 33-34 and response. An Experian credit report for Ms. Burch dated February 10, 2006, Bates No. CHF 000004, also shows the Chase loan as having been foreclosed. *Id.*, ¶ 33 and response.

Rather than having acquired the information from an electronic transfer of information from Chase, it appears that on August 8, 2005, TransUnion made a credit inquiry to Chase concerning this account. *Id.*, ¶ 36 and response. On August 26, 2005, a Chase employee misread the account information and erroneously reported to TransUnion that the account had only been paid off after it had been referred to foreclosure. *Id.* When Plaintiffs reported the incident to Chase, Chase published a letter on December 5, 2005, for use by Plaintiffs, stating that Plaintiffs had paid the loan in full. *Id.* After further inquiry from Plaintiffs, on February 24, 2006, Chase also sent a letter to Ms. Burch indicating that it had sent a request to the credit reporting agencies asking them to remove any references to foreclosure. *Id.*, ¶ 118.

It is undisputed that the Underwriting Summary prepared by Chase for the refinance of the Holmes Street property that closed on October 21, 2001, showed that Ms. Burch's three credit ratings for that time period were 627, 668, and 695. *Id.*, ¶ 107. According to

8

the custom in the underwriting industry, Chase based its underwriting review of Ms. Burch's application on the middle of the three scores, that is, the 668 credit score. *Id.*

In an attempt to establish damages, for the period of July 2003 through December 2005, Plaintiffs prepared a chart of the properties they owned, the loan amounts on those properties, and the type of loan and interest rate they were actually paying on the properties. *See* Bickerstaff Depo., Exh. 33. The final two columns on the chart are the "interest rate they should have received" and the "additional percentage paid above the proper rate." *Id.* The types of loans on the chart are (1) LIBOR interest only with principal paid at end of loan period, (2) ARM fixed interest for five years and then adjustment, and (3) Line of Equity. None of the loans were 30-year fixed interest rates. *Id.*, ¶ 86. Mr. Bickerstaff prepared this chart but agrees that he has no expertise in calculating interest rates or evaluating loan packages. *Id.*, ¶ 82. Mr. Bickerstaff admitted that the calculation is "pretty complex" and "there's a lot of factors involved." *Id.*, ¶ 83.

Mr. Bickerstaff consulted a website www.hsh.com to obtain information about interest rates. *Id.*, ¶ 84. Using the website, Mr. Bickerstaff then obtained an "average" interest rate for all loans issued in the southeast, mainly Georgia, for 30-year fixed rate loans to borrowers with "A" credit or "good credit," *id.*, ¶ 87, as of the date the properties had been refinanced. Mr. Bickerstaff could not specifically recall what the website defined as "A" credit or "good credit." *See* Bickerstaff Depo., at 175. He recalled that it was not very

9

specific and he does not believe that a specific credit score was affiliated with the category. *Id.* at 176. "I don't remember seeing like if your credit score is 700 to 780, it would be this. So I think it was a little bit more general than that." *Id.* The "average" interest rate provided by the website for the State of Georgia does not represent an average interest rate that would have actually been available for a particular loan program at that time because that information is not available. *See* DSMF, ¶ 88. Mr. Bickerstaff does not know what mix of factors lenders would use to grant a rate similar to the one listed as an "average" by the website. *Id.*, ¶ 89.

Mr. Bickerstaff then obtained "good faith estimates" of the closing costs involved in refinancing the loans at that time. *Id.*, ¶ 92. The good faith estimates were prepared by Brian Daiker of Countrywide Mortgage and reflect his estimates of what the costs would be to close on loans for nine properties as of the date listed on his estimates. *Id.*, ¶ 93. Mr. Daiker testified that Plaintiffs contacted him and asked something like "find out what the cost is for these rates on these properties and just provide us with a good faith estimate on it." *See* Daiker Depo., at 100. He recalls that Plaintiffs gave him information on property, rate, value of the property, and what the remaining balance was on the property. *Id.* He was not given appraisals. *Id.*

Plaintiffs base their claim for damages on the lists of costs in refinancing loans provided by Mr. Daiker and the calculation of the increased payments they have based on

the higher interests rates they are paying rather than the "average" interest rate shown by the www.hsh.com website for 30-year fixed interest rate for borrowers with "good credit."

Because Plaintiffs rely substantially on the testimony of expert John Ulzheimer and witness David Wright, the court reviews it in detail. In his affidavit filed in connection with his appearance in this case, Mr. Ulzheimer testified:

> Due to their ability to directly affect consumers' credit scores, credit reports and credit reputation, lenders entrusted by the credit reporting agencies with the ability to add, alter, or change consumer credit information appearing on their credit reports should be held to the highest standard of care in protecting and maintaining the accuracy and integrity of such credit information.

*Id.*, ¶ 8. He further states that the tax fi fas on the 795 Holmes Street property appear on Plaintiffs' credit reports and will remain there through 2009 "causing damage to Plaintiffs' credit reports, credit scores and credit reputation." *Id.*, ¶ 9. Once the tax liens were recorded by Fulton County, "a common and foreseeable result of the recording" was that "they would be picked up by and reported by the credit reporting agencies thereby causing damage to Plaintiffs' credit reports, credit scores and credit reputation." *Id.*, ¶ 10. The 2001 tax lien appears as multiple liens on some of Plaintiffs' credit reports having a "compounding negative effect" on Plaintiffs' credit score. *Id.*, ¶ 11.

> As a result of the negative information relating to the tax fifas appearing on their credit reports, Plaintiffs['] credit scores have been adversely affected and they have been denied certain loans and have also been forced to accept higher interest rates on other loans for which they were still able to qualify.

*Id.*, ¶ 12.

> Due to the limited ways that information is gathered from data furnishers and compiled to create consumer credit reports, the only reason that Experian would have reported Chase Loan #0909843901 as a foreclosure on Ms. Burch's February 10, 2006 credit report would be because Chase had reported that information to Experian on or near February 10, 2006. Each of the credit bureaus compile their own information independently of the others, and they do not share consumer information between themselves.

*Id.*, ¶ 14. It is foreseeable that the erroneous report of a foreclosure would have a negative impact on Ms. Burch's credit rating as it is commonly considered a "major derogatory item" in credit risk scoring models. *Id.*, ¶ 17.

> As a result of the improper and incorrect information appearing on Plaintiffs' credit reports as a result of Chase's actions and/or inaction discussed above, Plaintiffs have incurred damages as a result of the less than optimal interest rates they received on the nine loans financed during the relevant time period, have incurred damage to their credit scores and credit reputation, and have incurred significant attorneys' fees and expenses in pursuing this litigation.

*Id.*, ¶ 20.

In his deposition taken in conjunction with this litigation, Mr. Ulzheimer expanded on many of these topics. As to his experience with the lending aspect of the credit industry, Mr. Ulzheimer testified:

> Q    And you haven't – other than your lectures that you described, and other contact while you were at Fair Isaac, you have not been involved with the underwriting part of the credit process that the lenders actually go through; is that correct?
>
> A    That's right.
>
> . . . .
>
> Q    You've not had any experience in actually assessing the qualifications of a particular borrower for a particular lending program of a particular lender, have you?

12

A     For aggregate, sure.  But on day-to-day basis, no.

Q     Okay.  What do you mean by aggregate?

A     Meaning that as we've talked about earlier, one of the things they did in addition to my other functions at Fair Isaac were to help with creating strategies.

        And those strategies were always around how can we better refine our score requirements in order to try to capture more consumers and more better consumers, or more consumers that have low credit risk, how can we change our score requirements.

Q     Okay.  But you've never been involved in the actual review of a particular borrower to see if the borrower meets the criteria of a particular lending program, is that true?

A     I have been involved – when I was at Equifax, people would sometimes ask us to look at their credit report.  When I was at Fair Isaac, we were asked ad nauseam by people in the mortgage industry to interpret credit reports and scores because it was new to them and they, quite frankly, didn't have the same type of experience with it that the credit card issuers did.

Q     Okay.  You were asked to interpret the credit scores for the lender?

A     Correct.  Why is this score where it is, what does this mean to me, is this a good applicant or is this a bad applicant?  What should I do?

Q     Okay.  So you were asked to determine whether the lender should lend money to this particular person?

A     Believe it or not, there were some instances where we were asked to make that decision or help – I mean, it wasn't our decision, but we were certainly asked to help make that decision.

Q     All right.  But you've never had any training in their program?

A     Oh, I have never worked for a lender, you know, but they also never worked for Fair Isaac, but they were using the tools, so they would rely on us for clarification.

*Id.* at 111-13.  He further stated:

Q     [W]hat experience do you have in evaluating servicing of loans?

A     Of mortgage loans?

Q     Yes.

A     I have never personally serviced a mortgage loan.

AO 72A
(Rev.8/82)

> Q     All right. And so you're not familiar with the processes or procedures involved in the internal operations of a servicer, a loan servicer, such as Chase; is that correct?
>
> A     That's correct. I have never worked for a loan servicer.

*Id.* at 150-51. Mr. Ulzheimer also testified that he had no personal experience in determining interest rates a lender may charge and the relationship of that interest rate with a borrower's credit score. *Id.* at 242-43.

With respect to issues of causation, Mr. Ulzheimer testified that the appearance of a tax lien on Plaintiffs' credit history affected Plaintiffs' credit score in the following manner:

> A     Well, it's my understanding that the tax lien was picked up in a limited fashion, meaning that it wasn't picked up across the board by all bureaus for both plaintiffs all the time. So but I'll continue to answer the question because I have two parts.
>
>      From a numeric perspective, in other words, what is the numeric impact of this incident as we talked about this earlier with inquiries, the best that anyone can other than the developer who is with FICO[3] who has the score cards in front of him, is going to be able to do is what I'm going to be able to tell you is, A, there is an impact and here is roughly the impact is what I believe that it is.

*Id.* at 154.

Numerous times in his deposition, Mr. Ulzheimer referred to the fact that it may not be possible to pinpoint one particular reason for a change in credit score. For example:

> Q     But a longer credit history will increase your [credit] score?

---

[3]FICO is the name of a credit score calculation developed by the Fair Isaac Corporation and used by many lenders to determine credit risk.

A      All things being equal elsewhere.

Q      And, again, any one factor cannot be used to determine your credit score; is that correct? It's a combination of a number of factors?

A      Nothing happens in a vacuum. It's a combination of a variety of things. You can certainly point to certain things and blame things on certain things, or not blame things on certain things, but you can't always say, well, this is the only reason that happened.

*Id.* at 90. When discussing whether the number of credit inquiries might have an effect on a credit score:

Q      And you wouldn't know how much of an effect they would have?

A      You wouldn't. I mean, directionally you could make a – the only way to know the exact point value of anything, whether it's an inquiry or a late payment or a new account, is to sit down with the actual FICO score cards and essentially handscore the credit report at that point in time. That's the only way. And then pull out that data that you want to measure yes and no.

So in other words, you pull out the inquiries and re-handscore the file a second time and you say the difference was 4 points, and you can attribute it to that one . . . piece of information. That is the only way to do it.

Q      Have you done that in this case?

A      In this case? No, I don't have access to the FICO score cards. Only somebody – only a developer would have access to them.

Q      Okay. So only someone that worked for Fair Isaac could do that?

A      Correct.

*Id.* at 105. He further testified:

Q      Is it true – and I think you state this in your book – that no particular event has a specific point value, that each event has to be compared in relation to all the other factors being considered in the score; is that correct?

A      That's primarily correct, yes, you could certainly cherry-pick the oddball example, but, you know, this [book] was written for consumers, not for one consumer, so . . .

15

Q But in general, that's the way the credit score works, it's an interplay of a variety of considerations to come up with a score; is that correct?

A That's correct. And generally things don't occur in a vacuum.

Q And even the passage of time affects the credit score of an individual?

A That's correct.

Q Is it true that there are some lenders who use their own internal credit score to determine who they want to lend to?

A That's true.

Q And those lenders would use something entirely different from FICO; is that correct?

A Most lenders who use a custom model, which is what you're referring to, use a custom model that has other scores as components within their custom model. And in most cases, they'll use FICO as a component of their custom model.

Q But, again, that would be – the FICO score would be simply one consideration of these lenders who do that; is that correct?

A It's a huge consideration, but, yes, a consideration.

*Id.* at 113-15. And similarly:

Q Now, do you know of what lenders use that – use their own customized scores?

A Most large lenders – using a custom model requires them to either build it themselves, or hire a company like Fair Isaac to build it for them. They are expensive, and they have to be maintained like any system needs to be maintained.

  So generally the larger the lender, the more likely it is that they'll use some sort of custom tool versus just a credit bureau based scoring model.

Q All right. Would you have cause to know which specific lenders do that other than just generally the larger ones?

A I don't have a list of what large lenders use. And just anecdotally, I have spoken with some lenders, and they refer to their custom scores or pooled scores, which is a variety of a custom score. So but from that perspective, you know, I don't know that any of them publish "we use a custom score."

But generally it's unlikely that you'll find Federal Employees Credit Union using a $2 million custom model. At Citigroup it wouldn't be a surprise if they did.

Q  Or how about Countrywide Mortgage?

A  The difference with a mortgage lender is they are heavily dependent on an influencing body and in this case it's the GSE's [government-sponsored enterprises].

Q  What is that?

A  Fannie Mae and Freddie Mac.

Q  Okay.

A  And so Fannie Mae and Freddie Mac in many cases dictate to mortgage lenders like Countrywide what scoring model they will allow to be used for the purposes of underwriting a loan, if they are, in fact, going to purchase the paper from Countrywide.

Q  Do you know what scoring models they require?

A  FICO. They publically endorsed the use of the FICO score in the mid-Nineties, and over the period of a few years – by 1997, when I started at Fair Isaac, the mortgage industry was full-blown using the FICO score for underwriting.

*Id.* at 115-17. He continued:

Q  And while many lenders use FICO scores to help them make lending decisions, each lender has its own strategy, including the level of risk it finds acceptable for a given credit product, is that accurate?

A  That's correct.

*Id.* at 123.

He also testified that the tax lien problem on Plaintiffs' credit applications would result from all of the tax liens that appeared, *id.* at 248, but that it is impossible to determine the value of any particular tax lien without the credit score cards, which Mr. Ulzheimer did not have. *Id.* at 249. Mr. Ulzheimer also testified that it is possible that some credit reporting agencies will fail to pick up the record of a tax lien, and in this case, it appears that

17

only TransUnion had found the record. *Id.* at 261-65. For the lender Bank of America, which provided a credit rejection letter to Plaintiffs, the reason code for rejection was tax liens, but it is not possible to determine which tax liens. *Id.* at 271. There is a March 2007 report which shows TransUnion data of tax liens of $333 and $146, which both occurred in December 2002. *Id.* at 273. The rejection letter is dated January 24, 2006 and references a January 16, 2006 credit score that contains codes showing high ratio of balances to available credit limits and public record report. Mr. Ulzheimer agreed that both of those would factor into a 670 credit score. *Id.* at 275. He associated those January 2006 credit determinations with a March 2, 2007 credit report because with "the lack of credit reports on the exact snapshots of the denial letters, this is the best you can do." *Id.* "I'm saying that the data on this credit report could have existed when these applications were run, certainly." *Id.* "But the data could have been different as well." *Id.*

Mr. Ulzheimer looked at an adverse action letter from Wachovia that referenced the adverse public record and must be referring to the tax liens, but he was unable to say for certain whether the TransUnion report specified which tax liens. *Id.* at 278-79. Based on the proximity of time, it could be the relevant TransUnion credit report. *Id.* at 281.

Mr. Ulzheimer testified that when residential mortgage lenders make loan decisions, they pull credit reports from all three credit bureaus and use the credit score that falls in the middle. *Id.* at 117-18. But he further stated that mortgage lenders also consider factors

18

other than just the credit scores based on information not picked up by credit reporting agencies if they are sophisticated. *Id.* at 160.

When discussing the 641 credit score Ms. Burch had in July 2005, Mr. Ulzheimer testified that it includes "derogatory public record or collection filed, length of time since derogatory public record or collection, and length of time accounts have been established, too many inquiries over the last 12 months." *Id.* at 187. He believed that derogatory public record to be the primary reason for the score drop with the number two factor being the recency of the item. *Id.* at 188. But he is unable to testify as to "the amount each of those separate items specifically caused, how many points each of those reduced Ms. Burch's credit score" without having the "actual FICO score cards." *Id.* at 188-89. With respect to the report of foreclosure, Mr. Ulzheimer testified that he could not tell the amount of reduction in Ms. Burch's credit score as a result of the foreclosure reference but could say "it was the number one factor why her score wasn't higher, so it means that it's significant." *Id.* at 204.

When discussing Ms. Burch's credit score report of 706 on January 24, 2006, Mr. Ulzheimer stated, "some lenders that say anything above 700, the world is your oyster" but a statement by FICO that "most lenders will consider offering you very competitive rates and terms of loan products" is missing important context. *Id.* at 228-29. He agreed that "each lender is going to take the credit score and apply other data and information that it

gathers about the borrower and make a determination under their programs as to whether they meet the criteria." *Id.* at 234-35.

With respect to determining which interest rate a lender will give, Mr. Ulzheimer agreed that "at any particular time, lenders will have an array of interest rates they are willing to give for a particular credit risk." *Id.* at 240. He agreed that the same borrower could get a different rate at a different lender on the same day. *Id.* at 241. He further testified that "in this case you would have to apply for a loan to see what kind of good faith estimate you get back from the lender, depending on what state you live in for this particular type of mortgage." *Id.* at 243-44. The information given by an industry calculator, such as Informa, is used only to give a borrower an idea of the type of interest rate or loans that would be available. *Id.* at 241-44. The resultant number is an average of loan possibilities and the terms of the loans could vary based on the individual situations of the borrowers. *Id.* at 244.

Mr. Ulzheimer reviewed a Chase Manhattan Mortgage Corporation document from October 10, 2001, which listed the credit scores for Ms. Burch of Equifax 627, Experian 695, and TransUnion 668. *Id.* at 285. Equifax's code stated that the times since delinquency is too recent or unknown, too many inquiries in the past twelve months, level of delinquency on accounts, proportion of balances to limits on credit cards. *Id.* at 286-87. Experian listed proportion of balances to limits on credit cards too high, number of accounts with balances,

too many bank revolving accounts, and too many inquiries. *Id.* at 287. TransUnion reported derogatory public record, delinquency date too recent, balances to limits on credit cards, and level of delinquency. *Id.* Mr. Ulzheimer agreed that the credit scores for Ms. Burch that he reviewed in 2005 were higher than those she received in 2001. *Id.* at 289-90.

Mr. Ulzheimer specifically testified that he was not retained to give any calculation on damages. *Id.* at 290. He further stated:

Q [I]t's your testimony today that you are not able to state specifically how much each of these events lowered their credit score; is that correct?

A That's right. Just whether or not they did or didn't, and generally how much.

Q All right. And so you're not able to state what credit scores they would have actually had without these events to compare that with the credit scores they ended up with; is that correct?

A Well, I don't think it's fair to devalue what I understand about credit scoring to that level. I mean, I spent years inside of these things, and so I have a very good understanding of what the impact of these things are, and so I can make commentary or give an opinion; I just can't say it's worth exactly 27 points.

Q All right. But without finding – determining what their actual credit scores were, how would you be able to determine what a specific lender, what program a specific lender would make available?

A Sure, sure. I think it's reasonable to tie – and this isn't rocket science – I think it's reasonable to conclude that as your score increases, lenders are likely to view you as a lower risk, and, therefore, give you terms that are commensurate with consumers who have lower risk.

Q But you can't tell me what those specific differences in terms are?

A A lender can tell you. I can validate what they are telling you based on my understanding of the scores.

Q And, again, this would be – the damage that you're talking about is the combination of damage resulting from the foreclosure reference and the tax lien reference and this credit card report?

> A    Correct, that's right.
>
> Q    At varying times during their credit histories; is that correct?
>
> A    That's correct.

*Id.* at 291-93.

But to determine the damages in terms of allegedly increased interest payments, you "would have to provide to a lender this is what their scores should be, 720, 780, 810, whatever, and then get good faith estimates from them based on those scores." *Id.* at 294. Mr. Ulzheimer based his opinion that Plaintiffs' calculation of closing costs was reasonable based on his personal experience of "closing a dozen loans," but he could not determine what a particular lender would charge for closing costs on a particular loan. *Id.* at 299. With respect to damage to business reputation, Mr. Ulzheimer stated it would be embarrassing for individuals in the business of buying and selling homes to make an application for a loan and have a lender ask why you have a foreclosure. *Id.* at 299-300.

Plaintiffs also refer to the testimony of David Wright, an individual who worked with them to secure mortgage loans at the relevant time period around mid-2004. Mr. Wright worked as a consultant for clients of Family First. He was not a direct employee of Family First, but worked for the clients. *See* Wright Depo., at 23-24 & errata sheet. As a mortgage consultant, he looked at "an array of products and services, assist[ed] a client with decision-making in products and services, and l[e]d the client to the best package." *Id.* at 24. After about one year, Mr. Wright moved to work as a branch manager for Community Lending.

22

*Id.* at 26. After another year, he left Community Lending for Innergy Lending where he currently works as a loan officer. *Id.*

When he worked with First Family, he had approximately sixty lender-broker arrangements, meaning that he could offer the products of that many mortgage lenders. *Id.* at 39-40. Some of the lenders included Washington Mutual, Chase Manhattan, Wells Fargo, Countrywide, American Mortgage, and Long Beach. *Id.* at 40. Mr. Wright agreed that each of these lenders had "their own unique packages that would – might vary in some way from the other packages that you had available." *Id.* They also had "criteria that varied in some degree or had different loan packages that might – that one might offer a better deal at one point than the other." *Id.* Mr. Wright would then try to find the package that most suited his client. *Id.* at 40-41.

During the 1999-2002 time frame, Mr. Wright acted as the broker on approximately ten loans related to Plaintiffs, eight referred by Ms. Burch and two for Ms. Burch and Mr. Bickerstaff personally. *Id.* at 47-48. After 2002, Mr. Wright only did one loan for Plaintiffs and that related to the house on 795 Holmes Street. *Id.* at 48. But that loan did not go through. *Id.* Mr. Wright believes that loan to be in 2004. *Id.* at 50. Mr. Wright was working as a mortgage consultant at the time and affiliated with First Family. *Id.* Plaintiffs wanted Mr. Wright's assistance in refinancing their mortgage. *Id.* at 51. Mr. Wright recalls that the property was a condominium which limits the number of lenders willing to finance

AO 72A
(Rev.8/82)

it, but that he had located American Mortgage to take the refinancing. *Id.* at 51-53. He testified that he had found a loan with a 6.25 interest rate that would save Plaintiffs $275 per month. *Id.* at 55-56. There were potentially other lenders with similar rates available, but Mr. Wright was familiar with American Mortgage and found their underwriting to be the most favorable. *Id.* at 60. Mr. Wright agreed that if he could not get this loan through American Mortgage, he could have gone to another lender. *Id.* at 61.

Mr. Wright testified that he believed Plaintiffs' credit scores to be in the high 600s, lower 700s and that was a good score that met the guidelines for the American Mortgage loan program he sought. *Id.* at 61-62. Mr. Wright sent the loan application and supporting documentation to the loan processor who obtains a credit report and a title report. *Id.* at 63. Mr. Wright spoke with the processor and the loan underwriter. *Id.* at 65. The loan processor told Mr. Wright that there was a problem with the title report because there was a fi fa on the report. *Id.* at 65. American Mortgage wanted the fi fa taken off. *Id.* The underwriter told the processor that the loan would not be allowed to proceed. *Id.* at 71. Mr. Wright, however, never saw the title report himself. *Id.* at 65. Mr. Wright told the Plaintiffs to get the fi fa cleared. *Id.* at 67-68. Mr. Wright went to the courthouse and obtained a copy of "a satisfaction of that FIFA." *Id.* at 71. He turned it over to the loan processor, who turned it over to the underwriter. *Id.* at 72. Mr. Wright believes that he spoke to the underwriter on one occasion and asked whether an exception could be made considering the letter that

Mr. Wright had obtained.  *Id.* at 73.  Mr. Wright, however, did not know what about the document he obtained that was still problematic for the underwriter, and he did not receive a "full evaluation of why the loan was actually rejected."  *Id.* at 78.  He did state, "we receive condition sheets, and the FIFA was the predominant component."  *Id.* at 78-79.  But the condition sheet was faxed from the underwriter to the processor and Mr. Wright apparently never saw it.  *Id.* at 79.

Mr. Wright also testified:

Q     And so did you attempt to find any other lenders who might have –
A     I had talked with the clients, and we had been through quite a bit. They wanted to stick with the rate that I found them with that company and at this point just shut it all down.
Q     All right.  So you could have found them a better rate than they currently had, but they weren't interested at that point.  Is that correct?
A     They decided not to continue after – yes, they decided not to continue.
Q     All right.  But they – you could have found them a better rate than they were currently using on their – the loan that they had.  Is that correct?
A     It's likely that there are other lenders, and that being the case, I could have.

*Id.* at 74-75.

## B.    Contentions

Defendants argue that Plaintiffs' breach of contract claim fails because Defendants paid the Fulton County tax bill as soon as they received notice from Plaintiffs that there was an amount due. Defendants also contend that the damages sought by Plaintiffs based on alleged injury to credit reputation are too remote and speculative under Georgia law. Defendants aver that Plaintiffs' breach of fiduciary duty claim fails because the requirement of an escrow account does not create a fiduciary relationship between the borrower and the lender. Defendants also argue that Plaintiffs' negligence claim fails because negligence in the performance of a contractual duty does not create a separate tort cause of action; rather, breach of contract can only give rise to a tort if the defendant has also breached an independent duty created by statute or common law. Finally, Defendants contend that Plaintiffs' claims for punitive damages and attorney's fees fail because there is no underlying claim surviving and because there is no evidence that Defendants acted willfully or in bad faith.

Plaintiffs respond that Defendants breached the security deed by failing to pay the 2001 supplemental tax bill in a timely manner. Plaintiffs further aver that it is a natural and foreseeable result of Defendants' actions that tax liens would be imposed by Fulton County and reported by the credit reporting agencies causing damage to Plaintiffs' credit rating and reputation. Plaintiffs contend they received good faith estimates of the closing costs to

26

refinance the nine loans at the interest rates available on the dates the loans were originally

obtained as investigated and reported by Mr. Bickerstaff. Plaintiffs argue that Defendants

had a duty to properly report credit card information and breached their fiduciary duty when

they failed to do so accurately. Finally, Plaintiffs aver that whether Defendants' actions

meet the standard for punitive damages is a question for the jury, as is whether Plaintiffs are

entitled to attorney's fees pursuant to O.C.G.A. § 13-6-11.[4]

## II.     Discussion[5]

### A.     Preliminary Matters

The parties have filed numerous motions to strike testimony. Defendants filed a

*Daubert* motion to strike portions of the testimony of Plaintiffs' expert, John Ulzheimer.

They have also filed a motion to strike portions of the testimony of David Wright, Ben

Bickerstaff, and Tawn Chi Burch on hearsay and lay opinion objections. Plaintiffs filed a

motion to strike portions of Defendants' responses to Plaintiffs' statement of material facts.

---

[4]Plaintiffs also argue that Defendants improperly charged a credit card for an appraisal and then refused to credit the account and reported a late payment charge despite the fact Plaintiffs disputed the charge. This allegation was not raised in Plaintiffs' complaint and the court does not consider it further.

[5]While the court agrees that there appears to be no logical reason to split Defendants' motion for summary judgment into two parts as Defendants did, the court will not strike the motions for failure to comply with the Local Rules as to page limitations. The law favors a disposition of a case on the merits, and the parties have fully briefed all matters before the court. The court DENIES Plaintiffs' motion to strike Defendants' motions for partial summary judgment [39].

AO 72A
(Rev.8/82)

While there are potentially meritorious arguments in those motions, the court finds that even accepting the testimony as presented by the parties, Plaintiffs cannot satisfy their causes of action with respect to causation and damages, and thus, the court finds it more judicially efficient to address those issues first. For this reason, the court DENIES AS MOOT Defendants' motion to strike affidavit and expert opinion [45]; DENIES AS MOOT Defendants' motion to strike affidavit of Ben Bickerstaff and Tawn Burch [46]; DENIES AS MOOT Defendants' motion to strike testimony and letter of David Wright [47]; and DENIES AS MOOT Plaintiffs' motion to strike response [50].

### B.    Breach of Fiduciary Duty

Plaintiffs claim that "Chase owed them a fiduciary duty to properly report credit information to credit reporting agencies due to their superior position due to their ability to add information to credit reports that could adversely affect a consumer's credit." *See* DSMF, ¶ 136 and response. In Georgia, "fiduciary duties and obligations are owed by those in confidential relationships." *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 606 (1998). Section 23-2-58 of the O.C.G.A. defines a confidential relationship as "[a]ny relationship . . . where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."

AO 72A
(Rev.8/82)

"When a fiduciary or confidential relationship is not created by law or contract, we must examine the facts of a particular case to determine if such a relationship exists." *Yarbrough v. Kirkland*, 249 Ga. App. 523, 527 (2001). Questions of whether a confidential relationship exists or whether the particular circumstances justify the imposition of an obligation to communicate are generally reserved for the jury. *Id.*; *First Union Nat'l Bank of Ga. v. Davies-Elliot*, 207 Ga. App. 791, 793 (1993). However, a trial court may decide these questions as a matter of law "[w]here the facts are patent, unambiguous, and undisputed." *Middleton v. Troy Young Realty*, 257 Ga. App. 771, 773 (2002); *see also Williams v. Dresser Indus.*, 120 F.3d 1163, 1168 (11th Cir. 1997) (applying Georgia law) ("when the facts do not authorize the finding of a confidential relationship, the trial court does not err in deciding the issue as a matter of law").

Courts in Georgia have held that there is no confidential relationship between a bank and its customers, a savings and loan association and its customers, a lender and borrower, or a mortgagee and mortgagor. *See generally Pardue v. Bankers First Federal Sav. & Loan Ass'n*, 175 Ga. App. 814, 814 (1985). "The mere fact that one reposes trust and confidence in another does not create a confidential relationship. In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone." *See, e.g., Moore v. Bank of Fitzgerald*, 225 Ga. App. 122 (1997) (citing *Lewis v. Alderman*, 117 Ga. App. 855 (1968), and *Dover v. Burns*,

186 Ga. 19, 26 (1938)). *See also Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1341 (11th Cir. 2000) ("Under Georgia law a mortgagee's administration of an escrow account gives rise to neither a trust not an agency relationship.").

Plaintiffs have adduced no evidence in this case to demonstrate that the relationship between them and Defendants was confidential such as to give rise to a fiduciary duty, and the court grants Defendants' motion for summary judgment on Plaintiffs' breach of fiduciary duty claim.

## C.    Causation

Once a contract is shown, the party claiming a breach of contract has the burden of pleading and proving (1) the breach[6] and (2) "the resultant damages to the party who has the right to complain about the contract being broken." *Budget Rent-A-Car of Atlanta, Inc. v. Webb*, 220 Ga. App. 278, 279 (1996) (quoting *Graham Bros. Constr. Co. v. C. W. Matthews Contracting Co.*, 159 Ga. App. 546, 550 (1981)).

> To state a cause of action for negligence in Georgia, the following elements are essential: "(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to

---

[6]Plaintiffs' breach of contract action arises out of the escrow provision of Section 3 of the Security Deed. Although the court need not reach this issue, it appears clear that there is a dispute of fact as to whether Defendants received notice of the tax liability from Plaintiffs in either September 2002 or November 2002 prior to Plaintiffs' alleged third attempt to notify Defendants of the problem in March 2003.

AO 72A
(Rev.8/82)

the plaintiff's legally protected interest as a result of the alleged breach of the legal duty."

*Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 200 (1982) (quoting *Lee Street Auto Sales, Inc. v. Warren*, 102 Ga. App. 345 (1960)); *Tucker Federal Sav. & Loan Ass'n. v. Balogh*, 228 Ga. App. 482, 483 (1997).

Thus, for their breach of contract, negligence, and damage to reputation claims, Plaintiffs must be able to establish causation and damages. A wrongful act is the proximate cause of an injury when the injury can be directly traced to the act, and the injury would not have resulted "but for" the act. *See*, *e.g.*, *Parris v. Pledger Ins. Agency, Inc.*, 180 Ga. App. 437, 439 (1986). To satisfy its burden of production on the element of proximate cause, a plaintiff must introduce evidence that allows for the reasonable conclusion that it is more likely than not that a defendant's conduct was the cause of the injury. *See*, *e.g.*, *Anneewakee, Inc. v. Hall*, 196 Ga. App. 365, 367 (1990). When there is a mere possibility of causation or the jury would have to speculate, then the plaintiff has failed to meet his burden. *Id.*

Plaintiffs' theory is that due to Defendants' inactions, a tax lien was recorded on Plaintiffs' property, and this recording adversely affected Plaintiffs' credit rating to the point they could no longer receive mortgages at the rates to which they were accustomed. Similarly, Defendants' false reporting of a foreclosure on a property owned by Plaintiffs also caused problems in securing credit at a favorable rate.

31

There are several salient facts, however, which prevent Plaintiffs from establishing causation on this theory. First, Plaintiffs cannot show that the December 2002 tax lien or the false report of foreclosure (not picked up by all credit reporting agencies) were the sole cause of blemish to their credit ratings. The December 2002 tax lien was not the only lien reported on the property at 795 Holmes Street, Atlanta, Georgia. There are at least six other tax liens of record in Fulton County and Lumpkin County, Georgia, filed against Plaintiffs and the properties owned by Plaintiffs that are not alleged to have resulted from any act or omissions by Chase. *Id.*, ¶ 138. For example, Plaintiffs cite to a June 2005 credit score of 641 to show harm to Plaintiffs' credit rating. *See* Ulzheimer Depo., at 191-93 & Exh. 61. But those reports did not include a reference to the December 2002 tax lien. Rather, that credit report references a fi fa recorded in October 2004 on a different piece of property owned by Plaintiffs and released in January 2005. *Id.* Similarly, the tax liens referenced in the Experian credit report were released in July 2004 and could not have been the ones related to Defendants. *Id.* at 201.

Second, Plaintiffs cannot show that their credit rating was adversely affected during the relevant time period. It is undisputed that the Underwriting Summary prepared by Chase for the refinance of the Holmes Street property that closed on October 21, 2001, showed that Ms. Burch's three credit ratings for that time period were 627, 668, and 695. *Id.*, ¶ 107. Mr. Ulzheimer agreed that the credit scores for Ms. Burch that he reviewed in 2005 where higher

than those in 2001. *Id.* at 289-90. A credit report for Ms. Burch in January 2006, which references the foreclosure but not any of the tax liens, calculated a credit score of 706, a number which even Mr. Ulzheimer testified is satisfactory enough for some lenders to give access to attractive loan packages. *Id.* at 220, Exh. 65. Mr. Bickerstaff has an October 4, 2004 credit score of 782 from Equifax and a credit score of 767 from Equifax in a July 28, 2005 report that did not contain any references to tax liens. *Id.* at 170-71, 183, 194.

Third, Plaintiffs cannot show that they were unable to secure credit from a lender at the rate they desired. The only testimony Plaintiffs have provided that indicates a problem with acquiring any specific mortgage refinancing comes from David Wright. He testified that he had tried to secure refinancing for Plaintiffs on the 795 Holmes Street property in 2004 but was unable to do so. Assuming the admissibility of Mr. Wright's testimony, he stated that he was told by a loan processor that there was a problem with the title report because there was a fi fa on the report. Significantly, however, Mr. Wright also testified that he was familiar with American Mortgage and found their underwriting to be the most favorable. *Id.* at 60. But he agreed that if he could not get this loan through American Mortgage, he could have gone to another lender. *Id.* at 61. Specifically, Mr. Wright testified:

> Q    And so did you attempt to find any other lenders who might have –
> A    I had talked with the clients, and we had been through quite a bit. They wanted to stick with the rate that I found them with that company and at this point just shut it all down.

| Q | All right.  So you could have found them a better rate than they currently had, but they weren't interested at that point.  Is that correct? |
|---|---|
| A | They decided not to continue after – yes, they decided not to continue. |
| Q | All right.  But they – you could have found them a better rate than they were currently using on their – the loan that they had.  Is that correct? |
| A | It's likely that there are other lenders, and that being the case, I could have. |

*Id.* at 74-75.   Because Mr. Wright, Plaintiffs' own witness, testifies that he could have

found them a similar rate at a different lender had Plaintiffs desired to go forward, Plaintiffs

cannot show that Defendants' actions caused them not to be able to acquire credit under

desired conditions.   The court, thus, concludes that there is no evidence from which a

reasonable jury could conclude that Defendants' actions were the proximate cause of injury

to Plaintiffs, and the court grants summary judgment to Defendants on that basis.

### D.    Damages

In the alternative, the court also finds that Plaintiffs are not able to establish damages

with respect to their claims.  In Georgia, the

> ability to estimate damages to a reasonable certainty is all that is required and
> mere difficulty in fixing the exact amount will not be an obstacle to the award.
> The rule against the recovery of vague, speculative, or uncertain damages
> relates more especially to the uncertainty as to cause, rather than uncertainty
> as to the measure or extent of the damages.

*Pendley Quality Trailer Supply, Inc. v. B & F Plastics, Inc.*, 260 Ga. App. 125, 127 (2003).

But damages arising out of a breach of contract action "must be such as could be traced

solely to breach, be capable of exact computation, must have arisen according to the usual

AO 72A
(Rev.8/82)

course of things, and be such that the parties contemplated as a probable result of such breach." *See, e.g., Bauer v. North Fulton Medical Center, Inc.*, 241 Ga. App. 568, 572 (1999) (quoting *Crawford & Assoc. v. Groves-Keen, Inc.*, 127 Ga. App. 646, 650 (1972)).

Plaintiffs agree that they alleged their damages can be calculated by "[t]he difference between the loan charges that [Mr. Bickerstaff] incurred between 2003 and 2007 and the loan charges that [Mr. Bickerstaff] should have – that [Mr. Bickerstaff] claim[s] [he] should have received on those loans through 2003 and 2007." *See* DSMF, ¶ 132 and response. Mr. Bickerstaff, however, built these numbers on a shaky foundation. Even assuming the accuracy and reliability of www.hsn.com, a jury would have to speculate that the "average" interest rates available for individuals with "good credit" in the state of Georgia would have been available to Plaintiffs here. Plaintiffs' own expert testified as to the uncertainty of predicting interest rates. Mr. Ulzheimer agreed that "at any particular time, lenders will have an array of interest rates they are willing to give for a particular credit risk." *See* Ulzheimer Depo., at 240. He agreed that the same borrower could get a different rate at a different lender on the same day. *Id.* at 241. He further testified, "in this case you would have to apply for a loan to see what kind of good faith estimate you get back from the lender, depending on what state you live in for this particular type of mortgage." *Id.* at 243-44. The information given by an industry calculator, such as Informa, is used only to give a borrower an idea of the type of interest rate or loans that would be available. *Id.* at 241-44.

The resultant number is an average of loan possibilities, and the terms of the loans could vary based on the individual situations of the borrowers. *Id.* at 244.[7]

Further, Plaintiffs cannot use the credentials of Mr. Ulzheimer to bolster their speculative damages claims. Plaintiffs argue that "Mr. Ulzheimer presents evidence regarding the negative effect of the adverse information reported by Chase on Plaintiffs' credit scores and the adverse effect on their ability to obtain credit, as well as his opinion regarding Plaintiffs' damages." *Id.* Mr. Ulzheimer, however, gives no opinion on Plaintiffs' calculation of damages. He merely states that it seems reasonable to him. Mr. Ulzheimer has no background or qualification in economics or the calculation of damages under these circumstances. He provided no testimony that he tested Plaintiffs' theory of damages. Plaintiffs cannot bootstrap Mr. Ulzheimer's testimony to give some imprimatur of expertise to their own chart of damages.

---

[7]Plaintiffs are correct that in *Executive Construction, Inc. v. Geduldig*, 170 Ga. App. 560 (1984), a Georgia court authorized a damages calculation based upon increased interest rates, but that case is distinguishable because the plaintiff provided evidence of the difference in rates of construction loans between January and June of the same year. Plaintiffs have provided no evidence here that they would have been eligible to receive loans at the "average" rates quoted for individuals with "good credit" at the time they attempted to finance had they not had the problems with the tax lien and the foreclosure reporting. Further, *Executive Construction* also relied on the fact that there was evidence that the parties had anticipated problems with interest rates in the negotiating of the contract and thus it could be considered a consequential damage contemplated by the parties. *See Denny v. Nutt*, 189 Ga. App. 387 (1988).

AO 72A
(Rev.8/82)

Finally, it is not clear to the court that Plaintiffs have articulated any damages aside from their alleged lower credit ratings. To dispute Defendants' statement that Plaintiffs "cannot articulate any other damages unrelated to credit reputation," *see* DSMF, ¶ 134, Plaintiffs point generally to Mr. Ulzheimer's testimony. Mr. Ulzheimer, however, testifies *only* as to credit reputation. He provides no testimony as to damage to business reputation in general, although Ms. Burch did testify in her deposition that with her current credit ratings, lenders would not return her phone calls as quickly and did not seem as interested in working with her. For these reasons, the court finds that Plaintiffs' estimation of damages is purely speculative and could not form the basis of a decision by a reasonable jury to award damages, and the court grants Defendants' motions for summary judgment on that basis.

### E.    Punitive Damages

Alternatively, even were the court to find that Plaintiffs could succeed on any of their causes of action, the court would find that Plaintiffs are not entitled to punitive damages. Georgia law provides:

> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

37

O.C.G.A. § 51-12-5.1(b). "Negligence, even gross negligence, is inadequate to support a punitive damage award." *See Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118 (1988). Viewing the evidence in the light most favorable to Plaintiffs, there is nothing in the record to show that Defendants' actions were willful, wanton, or show the entire want of care. It is possible that Defendants made mistakes in the timely paying of Plaintiffs' tax bill (assuming that Plaintiffs can show Defendants received notice of the bill prior to March 2003). It also seems undisputed that an employee of Defendants inaccurately reported to a credit reporting agency a foreclosure on one of Plaintiffs' properties. The record, however, contains no evidence from which a jury could construe that those actions were willful or consciously indifferent. The record also shows that Defendants attempted to assist Plaintiffs in getting the tax lien marked as satisfied. Defendants also provided a letter to Plaintiffs and informed Plaintiffs they contacted the credit reporting agencies to correct any inaccurate reporting of a foreclosure. For these reasons, the court grants Defendants' motion for summary judgment as to Plaintiffs' claim for punitive damages.

> ### F.    Attorney's Fees

In their response to Defendants' motions for summary judgment, Plaintiffs assert that they are entitled to attorney's fees *inter alia* because Defendants had denied they improperly reported the foreclosure to the credit reporting agencies until Plaintiffs issued a subpoena of TransUnion in September 2007. For the same reasons as the court addressed with respect

to Plaintiffs' punitive damages claim, the court would also find that Plaintiffs were not entitled to attorney's fees under O.C.G.A. § 13-6-11. O.C.G.A. § 13-6-11 provides as follows:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

*Id.* "And statutory recovery for causing unnecessary trouble and expense is authorized if there exists no bona fide controversy or dispute regarding liability for the underlying cause of action." *See David G. Brown, P.E. v. Kent*, 274 Ga. 849, 850 (2002). Under Georgia law, the bad faith required for imposition of expenses is bad faith in the transaction underlying the cause of action. *Id.*; *Brown v. Baker*, 197 Ga. App. 466, 467-68 (1990). As there is evidence of a dispute between the parties on Plaintiffs' causes of actions and no evidence of bad faith, the court finds that Plaintiffs would not be entitled to attorney's fees pursuant to O.C.G.A. § 13-6-11 under the circumstances of this case and therefore grants Defendants' motion for summary judgment on this claim.

## III.    Conclusion

The court GRANTS Defendants' motion for partial summary judgment [30]; GRANTS Defendants' motion for partial summary judgment [31]; DENIES Plaintiffs' motion to strike Defendants' motions for partial summary judgment [39]; DENIES AS

MOOT Defendants' motion to strike affidavit and expert opinion [45]; DENIES AS MOOT

Defendants' motion to strike affidavit of Ben Bickerstaff and Tawn Burch [46]; DENIES

AS MOOT Defendants' motion to strike testimony and letter of David Wright [47]; and

DENIES AS MOOT Plaintiffs' motion to strike response [50].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiffs'

complaint.


**IT IS SO ORDERED** this 15th day of September 2008.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)